IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRIAN S. SUMMERVILLE,           )
                                )
     Plaintiff,                 )
                                )
     vs.                        )     Civil Action No. 07-842
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security, )
                                )
     Defendant.                 )

## MEMORANDUM OPINION

## I.  INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Brian S. Summerville and Defendant Michael J. Astrue, Commissioner of Social Security.[1]  Plaintiff seeks review of final decisions by the Commissioner denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*  For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

---

[1]  Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

1

## II.  BACKGROUND

### A.  Factual Background

Plaintiff Brian S. Summerville was born on September 24, 1966.  After graduating from high school in 1984, he worked as a stacker and press operator for a printing company for several years.  In November 1990, he went to work as a helper for a refuse company and two years later was promoted to "roll-off driver," responsible for picking up large, heavy refuse containers and taking them to a landfill or recycling center.  (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 5, "Tr.," at 64, 185.)  He then operated a back-hoe and dump truck for a municipality road crew while completing an 11-month police officer training class.  (Tr. 68, 185-186, 201.)  He began working as an armed guard for a private security company as of April 2002 where his duties included supervising four other guards and conducting security searches of vehicles entering the area of the underground mine facility where he was assigned.  (Tr. 73-74, 194.)

On March 10, 2005, Mr. Summerville went to the emergency room at Butler Memorial Hospital in Butler, Pennsylvania, complaining of blood in his urine and painful urination, conditions which were considered more serious than usual because he had previously donated one of his kidneys to a family member.  He was released to home care the same day with no apparent long-term effects or

2

serious bladder problems. (Tr. 96-107, 113.)

Also in March 2005, Plaintiff's long-term fiancee left him abruptly and, as he later described the situation, he "just didn't take it too well." (Tr. 187.) On March 18, 2005, he saw Dr. Michael J. Wahl, a general practitioner, stating he felt "depressed, down and tearful," but was not suicidal. Dr. Wahl started him on prescriptions of lexapro and ativan[2] and asked him to return in two weeks. (Tr. 166-167.) On March 28, Mr. Summerville reported to Dr. Wahl that he was "doing better," but that the dosage of his medication was insufficient. Dr. Wahl described Plaintiff's judgment, insight and memory as intact; he was oriented in three spheres and demonstrated no depression, anxiety or agitation. Despite these findings, Plaintiff reported he was still "stressed and depressed." Dr. Wahl concluded, "We will place him off work [and] he can apply for disability." He increased the dosage of lexapro and completed an Employability Assessment form for the Pennsylvania Department of Welfare, indicating Mr. Summerville would be temporarily disabled for one year beginning March 18, 2005. (Tr. 164-165; 138-139.)

_____

[2] Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. It is one of a class of antidepressants called selective serotonin reuptake inhibitors which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. Ativan (lorazepam) is also used to relieve anxiety. _See_ drugs and supplements entries at the National Institute of Medicine's on-line website, MedlinePlus, www.nlm.nih.gov/medlineplus (last visited April 28, 2008), "MedlinePlus."

3

On April 28, 2005, Mr. Summerville reported to Dr. Wahl that he was "feeling better," although he still complained of depression, anxiety, and difficulty getting to sleep. Dr. Wahl recommended he see a psychiatrist which he had not yet done. (Tr. 162-163.)

On May 5, Plaintiff consulted Dr. Wahl after he experienced blurred vision, a 6-hour nose bleed, and rectal bleeding. Along with these symptoms, his blood pressure was sufficiently elevated that Dr. Wahl prescribed lisinopril for benign hypertension. Plaintiff subsequently underwent a colonoscopy which showed no serious conditions. (Tr. 159-160; 112.)

Plaintiff reported to Dr. Wahl on May 19, 2005, that he had talked with a psychiatrist[3] who recommended an increased dosage of ativan since he was still waking up at night. Dr. Wahl noted that he would defer to the psychiatrist on this point but did not increase his dosage. Otherwise, Plaintiff stated that he felt "good." (Tr. 157-158.)

B.    Procedural Background

Despite this progress, on May 25, 2005, Plaintiff applied for disability insurance and supplemental security income benefits, claiming disability as of March 10, 2005, due to anxiety and depression. (Tr. 52-54, 168-172, 63-64.) When his applications

---

[3]    The Court has been unable to locate any notes from psychiatric or psychological treatment prior to June 8, 2005, when a psychosocial history and assessment interview was conducted. (See Tr. 114-119.)

4

were denied (Tr. 33-36; 175-179), Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.")

On June 13, 2006, a hearing was held before the Honorable James Bukes at which Plaintiff was represented by counsel. Judge Bukes issued his decision on July 28, 2006, again denying DIB and SSI benefits. (Tr. 12-21.) The Social Security Appeals Council declined to review the ALJ's decision on April 20, 2007, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the July 28, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on June 19, 2007, seeking judicial review.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to

support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
*citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d
Cir. 1986) (the substantial evidence standard is deferential,
including deference to inferences drawn from the facts if they, in
turn, are supported by substantial evidence.) If the decision is
supported by substantial evidence, the Court must affirm the
decision, even if the record contains evidence which would support
a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004
U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds
v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel,

6

228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy.[5] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Summerville satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured will be December 31, 2009.

---

[4] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5] The claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

7

To determine a claimant's rights to either SSI or DIB,[6] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* <u>Morales</u>, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7]

---

[6] The same test is used to determine disability for purposes of receiving either type of Social Security benefits. <u>Burns v. Barnhart</u>, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. <u>Sykes</u>, 228 F.3d at 263, n2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S.

Following the prescribed analysis, Judge Bukes first concluded that Mr. Summerville had engaged in substantial gainful activity after his alleged onset date of disability, March 10, 2005. In particular, he noted Plaintiff's testimony that he had worked part-time as a security guard from September 2005 through March 2006, and had left that job in order to go to work on a farm for three weeks. (Tr. 16; *see also* testimony at Tr. 187-190.) However, the ALJ found he "need not pursue this issue further" because of his ultimate conclusion that Plaintiff was not disabled at any time relevant to his decision.

Resolving step two in Mr. Summerville's favor, the ALJ found that his only severe[8] impairment was major depressive disorder with anxiety. He considered the medical evidence concerning Plaintiff's bladder problems, digestive problems, and hypertension, but concluded those impairments were not severe inasmuch as they did not have more than a minimal effect on Plaintiff's ability to

---

137, 146-147 n.5 (1987).

[8] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

hearing, Dr. Monaco testified there were numerous unskilled jobs which an individual of Mr. Summerville's education, experience, and non-exertional limitations could perform in the local or national economy. He provided the examples of surveillance system monitor at the sedentary level, unarmed guard at the light level, and janitor/cleaner at the medium level, all of which were defined as unskilled jobs. (Tr. 22; *see also* Tr. 205-206.) Based on Plaintiff's status as a younger individual[10] with at least a high school education, a history of work which did not provide transferrable skills, the medical evidence of record, and the testimony of Plaintiff and the VE, the ALJ determined at step five that Mr. Summerville was not disabled and, consequently, not entitled to benefits. (Tr. 21-22.)

## B. The ALJ's Analysis of the Medical Evidence

The factual background above discusses in detail the medical evidence from the period prior to Mr. Summerville's applications for DIB and SSI. Before addressing the four arguments Plaintiff raises in support of his motion for summary judgment, we summarize the rest of the medical records for the period May 2005 through May 2006, followed by a synopsis of the ALJ's analysis of the medical evidence.

1. *Medical Evidence:* After he applied for Social

---

[10] Plaintiff was 38 years old on his alleged disability onset date, making him a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c) and 416.963(c).

Security benefits, Mr. Summerville continued to consult regularly with Dr. Wahl. In June 2005, at a medication check appointment, he reported "no concerns" about his depression and anxiety. His medications remained stable and he was directed to follow up in six months. (Tr. 155-156.)

Soon thereafter, Mr. Summerville began receiving psychological counseling through a program at Butler Memorial Hospital Family Services, also called "Family First." On June 8, 2005, he underwent an initial interview in which he described the initiating problem for his depression as the breakup with his fiancee and his primary stressor at the time of the interview as the lack of a job and financial stability. He indicated problems with sleep, reduced appetite, and "having a depressed mood all the time." He denied any suicidal or homicidal thoughts or past attempts. In a mental status exam, all characteristics were within normal limits except he was restless, with flat affect and anxious mood; seemed to demonstrate below average intelligence, and was believed likely to have poor judgment and insight as well as only fair impulse control. His concentration and recent memory were both described as within normal limits, although he reported he had lost his job as an armed guard due to lack of concentration following the breakup. He was diagnosed with adjustment disorder with depressed mood, rule out major depressive disorder and dysthymia. His Global

12

Assessment of Functioning ("GAF") score[11] at the time was estimated to be 52. It was recommended that he participate in individual weekly therapy in order to help build self-esteem and cope with depression. (Tr. 114-119.)

On June 28, 2005, in an initial psychiatric evaluation, he reiterated his ongoing depression and sleeplessness following the break-up with his fiancee. The physician substituted trazodone for ativan and included depression and dysthymia among the possible diagnoses. His GAF at that time was 52-55. (Tr. 145.) During a July 2005 medication check with his doctor at Family First, Plaintiff stated he was "slowly getting better," despite intermittent sleep problems and depressed appetite. On August 9, 2005, he reported having had a "wonderful time" during a beach vacation with his sister, that he and his "ex" were now friends, and that his sleep and appetite were good; his affect was described as "bright." The follow-up plan was for him to seek information

---

[11] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). A GAF rating between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See the on-line version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited April 25, 2008 ("Online DSM-IV.") Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on a GAF score. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

about jobs and social contacts in the newspapers. In October, he reported he was working part time, his mood remained "very good," his appetite was good, and he was able to sleep six to seven hours each night. He was not cooking very much or going many places due to the price of fuel. During the interview he was relaxed and made good eye contact. His medications were continued without change.

In the last notes in the record from Family First, taken during a medication check appointment on January 12, 2006, he reported he was "overall doing well," his sleep was "fair," and while he was still emotional about his girlfriend, his thoughts seemed "reasonable" on that subject. His condition was described as stable and the physician directed him to continue therapy with the same medication dosages and to follow up in two or three months. (Tr. 146-149.)

Plaintiff was seen in March 2006 for follow-up by Dr. William A. DiCuccio who was in practice with Dr. Wahl. In the section of his notes entitled "history of present illness," Dr. DiCuccio commented that Plaintiff was "feeling ok," and had "been looking for jobs, but can't get work." He noted that despite his diagnosis of hypertension, Plaintiff did not have sufficient funds for his medication; however, his blood pressure was "actually good despite not taking lisinopril" which the physician decided to discontinue. Dr. DiCuccio further noted that he would continue the prescriptions for lexapro and trazodone. (Tr. 152-154.) He also completed

14

another state employment assessment form indicating Plaintiff would continue to be disabled due to anxiety and depression for the period March 20 through June 20, 2006. (Tr. 150-151.)

On May 30, 2006, at the request of Plaintiff's counsel, Mr. Summerville was interviewed by a psychiatrist, Dr. Robert L. Eisler. Dr. Eisler described Mr. Summerville as pleasant and cooperative during the interview, and noted he had been treated for depression for over a year. He further noted that "because he has no income, and no medical insurance, he can't afford medication." He reported "a very depressive mood," and that Plaintiff was "withdrawn," seldom leaving his home. He noted Mr. Summerville ate only once a day; his sleep was "quite erratic," ranging from two to 15 hours a night; and he experienced "frequent occipital headaches." His ability to concentrate was limited, he had suicidal thoughts but no plan, and about twice a week, he would hear a male voice telling him to "get even" with his former fiancee. He did not follow through on these commands, but felt "forced to do something." The psychiatrist reported that Plaintiff had "tried working in recent months but was unsuccessful." He could remember four of out four test memory words, did well with serial subtraction, could repeat a seven digit number, and did well on judgment questions. His GAF was ranked at 30. Dr. Eisler diagnosed Mr. Summerville with chronic and severe major depressive disorder with psychosis and opined that "this patient will in my

15

best medical opinion be unable to deal with any usual or regular employment for at least the next year." (Tr. 140-141.)

Dr. Eisler also completed a form document which ranked an individual's ability to make occupational, performance, and personal-social adjustments on a scale of "unlimited/very good," "good," "fair," and "poor/none." Based on the diagnosis above, he ranked Plaintiff's ability as no better than fair in any category except his ability to function independently which was rated as good. He further noted that Plaintiff's "depression precludes almost all work situations although he has tried." (Tr. 142-143.)

In August 2005, a non-examining state agency physician had performed a file review of Mr. Summerville's medical records to date. He concluded that although Plaintiff had been diagnosed with an affective disorder, he did not evidence more than mild restrictions in his activities of daily living or in his ability to maintain social functioning; he had moderate limitations in his ability to maintain concentration, persistence and pace; and there was no evidence he had experienced any episodes of decompensation. He further concluded that while Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions and in his ability to adjust appropriately to changes in the work setting, he was otherwise able to perform other work-related mental activities and functions over the course of a normal workday and workweek without difficulty. (Tr. 120-137.)

16

2. *Consideration of Medical Evidence Pertaining to Mental Impairments:* The Social Security Administration has developed a specific method by which evidence of mental impairments, including depression and anxiety,[12] are to be evaluated. Listing 12.04 sets out three categories which measure the severity and effects of the claimant's affective disorder, commonly referred to as the A, B, and C criteria. The "A criteria" require the claimant to show the medically documented persistence, either continuous or intermittent, of one or more depressive, manic, or bi-polar syndromes, marked by combinations of particular traits. In the case of depressive syndromes, the claimant must demonstrate any four of the following: pervasive loss of interest in almost all activities (anhedonia); appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions or paranoid thinking.

To satisfy the "B criteria," the claimant's mental impairment must be of such severity that it results in at least two of the

---

[12] The ALJ described Plaintiff's condition as "major depressive disorder with anxiety," and applied the criteria of Listing 12.04 but not those of 12.06, the Listing which pertains specifically to anxiety related disorders such as generalized persistent anxiety, panic attacks, obsessive-compulsive disorders, and post-traumatic anxiety disorder. In his brief in support of the motion for summary judgment, Plaintiff does not object to the ALJ's omission of this separate analysis; thus we conclude he has waived any argument in this regard and do not separately evaluate the medical evidence of anxiety according to Listing 12.06.

17

following: "marked"[13] restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[14]

To satisfy the "C criteria" of Listing 12.04, the claimant must present medical evidence that his affective disorder has lasted at least two years and has resulted in "more than a minimal limitation of ability to do basic work activities." The symptoms or signs of the affective disorder must be currently attenuated by medication or psychosocial support. The C criteria also require

---

[13] "Marked" is defined as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Listing 12.00C, *citing* 20 C.F.R. §§ 404.1520a and 416.920a.

[14] The phrase "episodes of decompensation" is defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household). . . . The term 'repeated episodes of decompensation, each of extended duration'. . .means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If [the claimant has] experienced more frequent episodes of shorter duration, or less frequent episodes of longer duration, [the SSA] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." Listing 12.00C.4.

18

the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or changes in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

To meet Listing 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria.

3. *The ALJ's Consideration of the Medical Evidence:*[15] The ALJ noted that beginning in June 2005, Plaintiff sought treatment for depression following the break-up with his fiancee in March. His analysis of the relevant records (Tr. 18, *citing* Tr. 114-119 and 144-149) closely follows that set out by the Court above.

Turning to medical evidence from Drs. DiCuccio and Wahl, the ALJ succinctly but accurately summarized those records, including a reference to the employability assessment forms completed by Drs. Wahl and Dicuccio covering, respectively, the periods March 18,

---

[15] Plaintiff does not raise any arguments with regard to the ALJ's analysis of the medical evidence regarding his bladder, digestive or blood pressure problems, including the conclusion that these impairments were not severe. Therefore, we confine our summary of the ALJ's consideration of the medical evidence to that pertaining to Plaintiff's depression and anxiety.

2005, through March 18, 2006, and March 20, 2006, through June 20, 2006. (Tr. 18, *citing* Tr. 152-167, 138-139, and 150-151.) For reasons discussed below in more detail, the ALJ concluded he would give no special significance to their opinions "insofar as they suggest an inability to perform all work activity, particularly for any 12 month period." (Tr. 19.)

The ALJ then considered the evaluation by Dr. Eisler. After accurately summarizing the text of his report and the occupational, performance, and social adjustment form, he concluded he would give "limited weight" to that assessment for several reasons. First, Plaintiff was referred to Dr. Eisler by his attorney only shortly before the hearing for a single consultative exam. Second, his conclusion that Plaintiff suffered from severe mental limitations was inconsistent with evidence provided by Mr. Summerville's long-term treating psychiatrist at Family First. Third, the adjustment limitations set out by Dr. Eisler in the form had been taken into account in the residual functional capacity adopted by the ALJ, limiting Plaintiff to simple unskilled jobs with numerous other restrictions to accommodate his mental impairments.

Finally, the ALJ considered the evaluation by the state agency physician and agreed with his conclusion that although Plaintiff demonstrated a severe mental impairment, his functional limitations did not preclude him from performing simple routine work tasks. He stated he had given this report "significant weight. . .because it

20

is generally consistent with the evidentiary record as a whole," in particular the functional limitations to be determined using the B criteria of Listing 12.04. (Tr. 20, *citing* Tr. 120-137.)

## C. Plaintiff's Arguments

In his brief in support of the motion for summary judgment (Docket No. 9, "Plf.'s Brief"), Mr. Summerville raises four arguments:

1. The ALJ improperly disregarded the medical opinions of Plaintiff's treating physicians, Drs. DiCuccio and Wahl, particularly their determination that he was disabled for the period March 2005 through June 2006, as well as Dr. Eisler's opinion that Plaintiff's affective disorder was sufficiently serious so as to preclude him from all forms of employment through at least May 2007;

2. Because he made at least two factual errors in his analysis of the medical evidence and Plaintiff's testimony, the ALJ erred in his RFC determination at step four of the analysis;

3. The ALJ erred by failing to include all of Plaintiff's specific limitations in the hypothetical questions posed to the vocational expert and by rejecting his answers to questions which did incorporate limitations supported by the medical evidence; and

4. The ALJ erred by finding that Plaintiff did not satisfy Listing 12.04.

We consider each of Plaintiff's arguments in turn.

1. *Improper Consideration of Medical Opinions:* Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who

21

have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, e.g., a one-time consultative examiner. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. §§ 404.1502 and 416.902.

The regulations also carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. §§ 404.1527 and 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) Id.; *see also* Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given

22

to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c)and 404.1527(d)(2).

Plaintiff argues that in derogation of this well-established treating physician doctrine, the ALJ "apparently misinterpreted" the employability assessment forms completed by Drs. Wahl and DiCuccio showing that they collectively considered him disabled from March 18, 2005, through June 20, 2006. Moreover, Dr. Eisler opined on May 31, 2006, that Plaintiff would be unable to perform any form of work for at least another year. Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinions of his treating physicians and by giving "significant weight" to the opinion of the non-examining state agency physician but not to the opinion of his examining physician, Dr. Eisler. (Plf.'s Brief at 7-10.)

As a threshold matter, we agree with Plaintiff that it appears the ALJ misconstrued the period of time for which Drs. DiCuccio and Wahl collectively considered Mr. Summerville disabled. It is clear that when considered together, the Pennsylvania Department of Welfare forms reflect their view that Plaintiff was disabled for a

period of 15 months.

However, we are not persuaded by Plaintiff's argument beyond this point for four reasons. First, although Plaintiff's treating physicians considered him disabled for purposes of receiving state welfare benefits (including medical assistance), that conclusion has little bearing on the ALJ's decision. It is well-established that decisions on certain issues – including the question of whether a claimant is able to work – are reserved to the Commissioner. *See* "Medical Source Opinions on Issues Reserved to the Commissioner," Social Security Ruling ("SSR") 96-5p.[16]  Thus, a physician's opinion that an individual is "disabled" is not a medical opinion and is not entitled to controlling weight. Smith v. Comm'r of Social Sec., No. 05-3533, 2006 U.S. App. LEXIS 10896, *15-*16 (3d Cir. May 1, 2006), *citing* 20 C.F.R. § 404.1527(e). On the other hand, the rules also provide that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . .[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p. Here, the ALJ explicitly discussed the employability assessment

---

[16]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

24

forms and applied the relevant law correctly with regard to the weight he should give the opinions of Drs. Wahl and DiCuccio on the subject of whether Plaintiff was "disabled," even though he was incorrect in his determination of the time period to which their opinions applied. (Tr. 18-19.)

Second, even if the ALJ had found the opinions of Drs. Wahl and DiCuccio persuasive, a decision by another governmental agency, e.g., a state welfare department, that an individual is disabled is based on its own rules, not those of the Social Security Administration and therefore is not binding on the Administration. 20 C.F.R. §§ 404.1504 and 416.904; Turby v. Barnhart, No. 02-2258, 2002 U.S. App. LEXIS 27385, *12 (3d Cir. Dec. 23, 2002) ("State agency determinations of disability are not binding on the Social Security Administration because the inquiries for eligibility are distinct.") However, where another government agency has determined that a claimant is disabled, that decision is entitled to substantial weight and the ALJ must explain his reasoning for rejecting it. See Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985). As the ALJ noted here, while the opinions of Plaintiff's treating physicians establish the existence of limitations based on his emotional problems, "their reports and the balance of the medical record do not rule out work within the scope of the residual functional capacity adopted herein." While this Court might have drawn a different conclusion from the medical evidence,

where the ALJ's conclusion is based on substantial evidence and he has explained his reasoning, we are bound by his determination. Gantt v. Comm'r Soc. Sec., No. 05-4566, 2006 U.S. App. LEXIS 27117, *2 (3d Cir. Oct. 31, 2006), *citing* Hartranft v. Apfel, 181 F.3d 358, 359 (3d Cir. 1999) for the principle that if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings "even if we would have decided the factual inquiry differently.")

Third, the ALJ rejected Dr. Eisler's opinion in part because much of his report was inconsistent with other medical evidence of record. Without reiterating all the evidence above, we simply state our agreement with this assessment. For instance, in the medical notes recorded by Dr. DiCuccio just three months before those by Dr. Eisler, there is no mention of social isolation, auditory hallucinations, frequent headaches, or suicidal thoughts; in fact, Plaintiff stated he was actively looking for work. (*Compare* Tr. 152-153 and Tr. 140-141.) In addition, although not mentioned explicitly by the ALJ, we find Dr. Eisler's report internally inconsistent. He commented that Plaintiff "can't concentrate," but also reported he could remember four of out four test memory words, did well with serial subtraction, and could repeat a seven digit number. Similarly, he rated his GAF at 30,[17]

---

[17] A GAF between 21 and 30 reflects behavior which is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent,

indicative of "serious impairment in communication or judgment," but also noted no difficulties in communication or speech patterns and stated that Plaintiff "did well on the judgment questions."

Finally, in order to be eligible for either DIB or SSI, the claimant must be disabled for a period of twelve consecutive months. Creegan v. Comm'r of Soc. Sec., No. 04-3717, 2005 U.S. App. LEXIS 14678, *2, n.2 (3d Cir. July 19, 2005), *citing* 42 U.S.C. § 423 (d)(1)(2), and Barnhart v. Walton, 535 U.S. 212 (2002). Plaintiff testified that by September 2005, i.e., within six months of the precipitating event which caused his depression and within four months of having applied for benefits, he was back at work part-time as an armed security guard. (Tr. 188.) He further testified that one reason he did not work more hours was the loss of state welfare benefits if he did so. (Id.) He also stated at the hearing that he quit his job with the security company in March 2006 because he was offered a full-time job on a farm, not because of any difficulties with concentration or other work-related functions. (Tr. 187.) And finally, he testified that at the time of the hearing he had been looking for a job but had not been able to find one that he could do. (Tr. 195.) Thus, Plaintiff's own testimony belies the supposition that he was disabled for twelve consecutive months.

---

acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). Online DSM-IV.

27

2. *Alleged Factual Errors on the Part of the ALJ:* Plaintiff argues that the ALJ erred in determining his residual functional capacity due to factual inaccuracies and the failure to take into consideration the limitations on his ability to work reflected in Dr. Eisler's report. (Plf.'s Brief at 10-12.) The first of the purported factual errors, the period of time for which Drs. Wahl and DiCuccio considered Mr. Summerville disabled, has been discussed at length above and will not be revisited.

The second alleged factual error concerns the ALJ's statements regarding Mr. Summerville's use of medication. Plaintiff argues that the ALJ misconstrued his testimony on this subject. The evidence shows he was compliant with his medications until he lost his state medical assistance benefits after he attempted to return to work. Moreover, he indicated at the hearing he would "prefer" not to take medication on a long-term basis because he was afraid of becoming a drug addict. (Plf.'s Brief at 10-12.)

In the section of his report which discussed the criteria of Listing 12.04, the ALJ stated with regard to the C criteria:

The record does not show any repeated episodes of decompensation, each of extended duration, which attests to a lack of disabling severity. The claimant has never required inpatient psychiatric hospitalization and *testified that he does not take any medications and further testified that he does not want to take any medications.*

(Tr. 17, emphasis added.)

Later in the decision, in his discussion of Plaintiff's

28

emotional problems, the ALJ wrote: "Claimant further testified that, currently, he is not taking any medications and also related that he has no desire to take medications because he is afraid of becoming dependent on them." (Tr. 20.)

We find the ALJ's references to the testimony are accurate and complete. Moreover, we are unable to find any inference in the decision that the ALJ concluded Plaintiff was not compliant with his medications when they were available. At the hearing, Plaintiff clearly testified that at the present time he was not taking any medications. When asked if the reason was because he had lost his welfare benefits, he replied,

> No. I tried to apply for a military job and they stated that I shouldn't be on any medications and also at the time, I was, I didn't know at the time, but I was to pay a co-payment and I didn't have the money to pay that. So I just quit taking them.

(Tr. 192.) He later testified that he had stopped taking any medications as of March 2006, i.e., about three months prior to the hearing, and that he thought his condition was "about the same" as when he had been taking them. (Tr. 193.) Later, the following dialogue took place:

ALJ: Do you think you're going to go back on medications when you [get public assistance again]?

PLF: I, I hopefully not because I, I don't . . .

ALJ: You just don't want to take it [sic]?

PLF: Well not that I don't, I don't want to take them, but I'm afraid of becoming a drug addict. . . . I don't want to take medication on a long term to become a drug addict.

29

(Tr. 195.)

We find the ALJ correctly reflected Plaintiff's testimony on his use of psychiatric medications, the effects of ceasing to take them, and his reasons for not wanting to use them on a long-term basis. In short, the use of the phrase "he has no desire to take medications because he is afraid of becoming dependent on them" in the ALJ's opinion does not reflect his misunderstanding or misconstruing of Plaintiff's testimony but was simply a more general reference to his fear of becoming a drug addict. We conclude, therefore, that Plaintiff's second argument for summary judgment in his favor is unavailing.

    3. *The ALJ's Disregard of the VE's Testimony and Use of an Incomplete Hypothetical Question:* Plaintiff contends the hypothetical questions posed by the ALJ to the vocational expert at the hearing were inaccurate because, contrary to well-established Third Circuit law, they did not consider all of his impairments. (Plf.'s Brief at 12-13.) At the same time, when the VE was asked questions which did incorporate those limitations, the ALJ rejected his answers. Specifically, the ALJ ignored Plaintiff's inability to perform reliably, follow work rules and deal with work stresses as reflected in Dr. Eisler's report which indicated Plaintiff had "poor or no" ability to perform those necessary work functions. (Id.) Again, we disagree that the ALJ erred in this regard.

At the hearing the ALJ asked Dr. Monaco the following

30

question:

> I'd like to pose the raw hypotheticals also concerning Claimant's age, education and work experience. First let's assume this person [would] be limited to simple instructions and should avoid changes in the work setting. Let's assume this person should avoid crowds, too. Should avoid direct interaction with the general public. Should avoid intensive supervision and should avoid decision making and competitive production rate pace. Would that allow for any forms of gainful activity?

(Tr. 205.)

Dr. Monaco responded that while Plaintiff could not perform any of his previous jobs, he would be able to work as a surveillance system monitor, as an unarmed security guard, or as a janitor or cleaner, particularly on an evening shift. (Tr. 205-206.) The ALJ then asked, ". . . [T]here's some indication of problems with reliability. Let's assume this person may miss one day of work a week. Would that affect your testimony?" The VE stated that employers would not tolerate such a 20 percent absenteeism rate. (Tr. 206.)

Plaintiff's attorney then asked, based on Dr. Eisler's report, if a person with "poor or no ability to follow work [rules]," or "poor or no ability to interact with supervisors," or "almost no ability to deal with any work stress" would be precluded from substantial gainful activity. Dr. Monaco testified that any of those problems would eliminate all employment. (Tr. 206-208.)

In his opinion, the ALJ specifically referred to the questions raised by Plaintiff's counsel. (Tr. 21.) At an earlier point, as

31

discussed above, he had determined that Dr. Eisler's conclusions should be given only "limited weight," and explained his reasons for this determination. (Tr. 19.) He further stated that the residual functional capacity he had described in his hypothetical questions and in his conclusions at step four of the analysis included all the restrictions which were supported by the record as a whole, including Plaintiff's testimony. (Tr. 18-21.)

A proper hypothetical question is one which reflects "all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). That is, the ALJ is not required to "submit to the vocational expert every impairment alleged by a claimant," but rather, "the hypotheticals posed must 'accurately portray' the claimant's impairments." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (internal citation omitted.) As the Court further stated in Rutherford, "Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible--the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." Id.

Part of the reason the ALJ rejected Dr. Eisler's conclusions was the inconsistency between his report and the notes by Plaintiff's physicians and psychiatrists from more than a year of treatment which did not allude to any of the highly restrictive

limitations Dr. Eisler described. Moreover, Plaintiff's repeated attempts to find work, documented by both his treating physicians and his own testimony (particularly his statement that he felt better when he was working (Tr. 199)), belie any suggestion that he was as restricted as Dr. Eisler concluded. We find no error by the ALJ in the reasons he gave for assigning little weight to Dr. Eisler's opinions, in the questions he posed to the VE, or in his rejection of the answers to questions posed by Plaintiff's attorney which incorporated Dr. Eisler's findings.

4. *The ALJ's Conclusion that Plaintiff Did Not Satisfy Listing 12.04:* Finally, Plaintiff argues that the ALJ erred by finding he did not satisfy the B criteria of Listing 12.04 in light of Dr. Eisler's report which indicated Mr. Summerville was markedly limited in his activities of daily living, social functioning, and concentration. He mentions a number of points from Dr. Eisler's report and his own testimony which would support the conclusion that he was markedly limited, e.g., he eats only once a day or every other day, his sleep is erratic, he hears voices telling him to "get even" with his ex-fiancee, he has serious difficulties with authority figures, he is reluctant to leave his home, he has no friends, and he is unable to concentrate on job responsibilities. Plaintiff argues, "It is unclear based on the very limited statements made by the ALJ why he believed that Plaintiff did not meeting the Listing at 12.04." (Plf.'s Brief at 14-16.)

33

As we have discussed at length above, the ALJ did not omit or ignore Dr. Eisler's report, in fact, he explicitly mentioned several of the details Plaintiff claims were overlooked. (Tr. 19.) He also discussed specific portions of Plaintiff's testimony and statements made in an activities of daily living questionnaire completed in July 2005. (Tr. 20; see also Tr. 84-93.) We agree that in his discussion of Listing 12.04, the ALJ did not refer to limitations suggested by Dr. Eisler, but we conclude he sufficiently and accurately summarized those restrictions at a later point in his analysis and explained why he rejected them. Contrary to Plaintiff's argument, we do not find the ALJ's analysis "beyond meaningful review" (see Burnett v. Commissioner of SSA, 220 F.3d 112, 119 (3d Cir. 2000)), and thus conclude that Plaintiff's contentions on this point must also fail.

Having considered each of Plaintiff's arguments for summary judgment in his favor, we find none of them requires remand for further consideration by the Commissioner. An appropriate Order follows.

May _____9_____, 2008

_William L. Standish_
William L. Standish
United States District Judge

cc: Counsel of Record